
Case 10-04039-dml Doc 30 Filed 12/16/10 Entered 12/16/10 08:33:40 Page 1 of 15



U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

**United States Bankruptcy Judge**

**Signed December 15, 2010**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § § | |
| JOSEPH J. DILLON, | § | CASE NO. 09-47546-DML-7 |
| Debtor. | § | |

_____

| | | |
|---|---|---|
| 2008 EFK, LLC | § | |
| Plaintiff, | § | ADVERSARY CASE NO. 10-04039 |
| | § | |
| v. | § | |
| | § | |
| JOSEPH J. DILLON, | § | |
| Defendant. | § | |

### MEMORANDUM OPINION

The above-styled adversary proceeding was tried to the court on November 4, 2010. At that time, the court heard testimony from Joseph Dillon ("Debtor"), James Eggleston

Memorandum Opinion – Page 1

("Eggleston"),[1] Frank Lawler and Susan Lawler. The court also received into evidence several exhibits offered by Plaintiff[2] and identified as necessary below.

This adversary proceeding is subject to the court's core jurisdiction. 28 U.S.C. §§ 1334 and 157(b)(2)(J). This memorandum opinion constitutes the court's findings of fact and conclusions of law. FED. R. BANKR. P. 7052.

## I. Background

In this adversary proceeding Plaintiff seeks to have excepted from Debtor's discharge a debt based upon a judgment (the "Judgment") taken in state court against Debtor by Triton Realty Partners I, L.P. ("Triton"), and assigned to Plaintiff. The Judgment, in turn, is based upon a personal check uttered by Debtor in the amount of $225,000.00. According to the pleadings in this adversary proceeding, though the state court suit included a claim based on fraud, that claim was voluntarily dismissed by Triton after it received partial summary judgment for the amount of the check plus costs.

The events leading to the state court suit involve real estate located in Parker County, Texas (the "Property"), that was owned by Triton. On January 14, 2008, Debtor, acting for J.D. Investments "and/or assign" ("JD"),[3] executed a contract for the purchase of the Property from Triton. Exhibit 1. The purchase price for the Property was stated in paragraph 3 as

---

[1] Eggleston, an attorney, did not explain his relationship to Plaintiff, but the court understood him to be Plaintiff's representative. Eggleston also was the principal of the managing partner of Plaintiff's assignor, Triton (defined below).

[2] Debtor offered no exhibits. Plaintiff's exhibits will be identified by number and otherwise as necessary.

[3] Debtor testified that he was acting for a group of investors. JD presumably is a corporate vehicle used by Debtor, a real estate entrepreneur, as a stand-in.

$6,929,431.80. In connection with the contract, JD deposited $300,000.00 of earnest money with Alamo Title Co.

The contract included an addendum that provides, *inter alia*, "Buyer to receive any and all monies from Gas Company for Easements." Exhibit 1, Addendum "A". This term refers to funds that were anticipated from sale of a pipeline easement.

Between its original execution and March 3, 2008, the contract was amended four times to change various dates set by the contract, including the closing date. On March 7, the parties executed a fifth amendment (the "Fifth Amendment") which postponed closing to April 30, 2008. The Fifth Amendment also provided that Triton could draw down $75,000.00 of JD's earnest money deposit to cover interest due to Triton's mortgagee and various other costs. Exhibit 1, Fifth Amendment.

At some point between execution of the Fifth Amendment and April 30, JD elected to terminate the contract and take back the remaining $225,000 of its earnest money. During the period prior to April 30, Triton received and expended the proceeds from sale of the pipeline easement.

Triton in the meantime had negotiated a back-up contract with a third party at a price of approximately $6,590,000.00. That contract, however, fell through as well. As JD remained interested in acquiring the Property, the parties reopened their discussions, leading to a meeting on April 30, 2008, at the Alamo Title Co. office. The meeting was attended by Debtor,[4]

---

[4] From the testimony it appears Debtor was accompanied at the meeting by a partner.

Eggleston and Frank Lawler and occurred in Susan Lawler's office while she worked at her desk.[5]

During the April 30 meeting, which occurred after banking hours, the parties executed a "Reinstatement and Sixth Amendment to Contract" (the "Sixth Amendment"). The Sixth Amendment provided that the terminated contract between the parties was reinstated (section 1), that the purchase price for the Property was $6,590,217.24 (section 3) and that the closing would occur on May 6, 2008. Most significantly, section 2 of the Sixth Amendment provided as follows:

> 2. **Earnest Money Deposit**. On or before 12:00 pm (CDT), May 2, 2008, Buyer shall deposit the sum of Two Hundred Twenty Five Thousand and No/100 Dollars ($225,000.00) (the "New Earnest Money") with the Title Company. Failure to timely deposit the New Earnest Money shall render this Amendment and Contract null and void except that the terms and conditions of Section 11[6] hereinbelow shall continue in full force and effect.
>
> The New Earnest Money shall be irrevocable and non-refundable for any reason whatsoever unless Seller shall fail to close the transaction described in the Contract as amended by this Amendment. Upon the closing of the Contract, the New Earnest Money shall be applicable to the Purchase Price specified in Section 3 below.

Notwithstanding that this provision required deposit of the New Earnest Money by noon on May 2, Eggleston insisted that the $225,000 be tendered at the time of the meeting. Absent that tender, Triton would not go forward with the transaction. In order to preserve the deal, Debtor made out his personal check for $225,000 and gave it to Frank or Susan Lawler. Though there is disagreement about whether Debtor, as he testified, cautioned that his account lacked the

---

[5] Susan Lawler is a closing officer for Alamo Title Co. Frank Lawler is a lawyer on retainer to the title company.

[6] There is no section 11 of the Sixth Amendment, and Eggleston could not explain the reference to it.

funds to cover the check, it appears everyone contemplated that Debtor's personal check would be replaced by noon, May 2, with a cashier's or certified check.[7]

Although the Sixth Amendment reinstated the original contract as previously amended, including Addendum "A", Eggleston took the position that the proceeds of sale of the pipeline easement were taken into account through the reduction of the purchase price. Eggleston testified that this interpretation had been reflected in spreadsheets circulated, including to Debtor, after receipt by Triton of the proceeds.[8] Debtor, however, testified that he believed the reduced purchase price was based on the price under the back-up contract, and that he did not become aware until May 2 of Eggleston's contention that Triton, not JD, would retain the proceeds of the easement sale.

When Debtor understood that the purchase price in the Sixth Amendment was meant to account for the pipeline easement proceeds, he decided that JD should not go forward with the transaction.[9] Instead of notifying Alamo Title Co., however, he simply failed to obtain and tender a cashier's or certified check to replace his personal check and ceased communications with the title company entirely.[10]

Meanwhile, Eggleston proceeded in anticipation of a May 6 closing. To that end, he

---

[7] On May 2, Eggleston sent a redlined version of the Sixth Amendment to Mark Bishop (Exhibit 2). One of the changes to the document was insertion in section 2 of the May 2 date, replacing April 30. The court infers from this that Eggleston originally expected a cash or cash equivalent earnest money deposit on April 30 and changed the date to allow for substitution for the personal check.

[8] The only spreadsheet introduced into evidence (Exhibit 2 and Exhibit 3A) is attached to communications of May 1 and May 2 – and the court finds no reference in it to the proceeds of the sale of the pipeline easement.

[9] An email from Debtor to the Triton partners (Exhibit 3B) suggests JD may have faced problems with a May 6 closing as well.

[10] Other than exhibits 3A and 3B, the record does not indicate what communications occurred between Debtor and Eggleston after execution of the Sixth Amendment.

provided Susan Lawler, acting as escrow officer, with spreadsheets that reflected the numbers as he understood them. Susan Lawler, however, was unable to reconcile Eggleston's spreadsheets to the contract, principally due to the allocation of the proceeds from the sale of the pipeline easement.

Consequently, at the request of Susan Lawler, Eggleston prepared a seventh amendment to the contract (the "Seventh Amendment"). The Seventh Amendment, in Eggleston's view, did no more than clarify the substantive terms of the transaction. Susan Lawler, on the other hand, testified, as did Debtor,[11] that the Seventh Amendment in fact changed the terms of the sale.

On May 5, 2008, Frank Lawler caused Debtor's personal check to be deposited.[12] Triton – again in the person of Eggleston – then "performed" the contract as amended by, *inter alia*, the Seventh Amendment by executing closing documents on May 6. Prior to that point, Debtor stopped payment on his check, which was subsequently dishonored. Triton's state court suit followed; after entry of the Judgment, on November 20, 2009, Debtor filed for relief under chapter 7 of the Bankruptcy Code (the "Code").[13]

## II. Discussion

Plaintiff asks that the debt represented by the Judgment be excepted from Debtor's discharge pursuant to Code § 523(a)(2)(A). Section 523(a)(2)(A) provides:

(a) A discharge . . . does not discharge an individual debtor from any debt –

. . .

---

[11] Debtor received the Seventh Amendment but never executed it on behalf of JD.

[12] Frank Lawler and Eggleston testified that the former informed Debtor the check would be deposited if no substitute were received by May 2 at noon.

[13] 11 U.S.C. §§ 101 et. seq.

> (2) for money, property, services, or an extension, renewal, or refinancing of credit to the extent obtained by ---
>
> (A)     false pretenses, a false representation, or actual fraud . . . .

Thus, to fall within section 523(a)(2)(A), a debtor must first have obtained something. *See* COLLIER ON BANKRUPTCY ¶ 523.08[1][a] (16th ed. 2009). Next, the debtor must have used a false representation or fraud to obtain that something. The Court of Appeals for the Fifth Circuit has distinguished between dischargeability actions based on false representations and those based on fraud,[14] but each requires that the debtor have made a misrepresentation on which the creditor relied and so was damaged. *See In re Mercer*, 246 F.3d 391, 403 (5th Cir. 2001); *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1292-93 (5th Cir. 1995). The complaining creditor must prove each element by a preponderance of the evidence. *See RecoverEdge*, 44 F.3d at 1292.

In the case at bar, Plaintiff contends that, as Debtor knew he did not have the funds to cover it, his utterance of his personal check constituted a misrepresentation on which Triton – that is, Eggleston – relied. Plaintiff goes on to argue that, due to the misrepresentation, the debt represented by the Judgment should be held non-dischargeable.

The first question the court must address in assessing this claim is whether Debtor obtained "money, property, services, or an extension, renewal, or refinancing of credit" by

---

[14]     *See RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1292 (5th Cir. 1995) ("When defining the elements of nondischargeability under [section] 523(a)(2)(A), we have distinguished between actual fraud on the one hand, and false pretenses and representations on the other.").

utterance of the check. In other words, did Debtor receive from Triton anything of value for his NSF check? The court concludes he did not.

Clearly Debtor received no money for his check. As to property, arguably he caused Triton to execute the Sixth Amendment, and so obtained a contract for the Property, but the contract would have no meaningful value unless it would close – and that in a mere week. So ephemeral a benefit is not what Congress intended in enacting Code § 523(a)(2)(A). Further, if Debtor tendered his check in expectation of consummating purchase of the Property, his act in doing so was not fraudulent, since the act must be accompanied by the requisite intent. "[A]n honest belief, even if unreasonable, that a representation is true and that the speaker has information to justify it does not amount to an intent to deceive." *In re Acosta*, 406 F.3d 367, 372 (5th Cir. 2005). And, in any event, paragraph 2 of the Sixth Amendment does not require that Debtor put up a check concurrent with the document's execution, so it is difficult to see how the Sixth Amendment was "obtained" by tender of Debtor's check.

Arguably, by tendering this check, Debtor bought two days – until May 2 – to deposit a cashier's or certified check for the required earnest money. This could perhaps be deemed an extension of credit. Again, even if the court were to conclude Triton extended two days of credit based on Debtor's check, so tenuous a benefit, given the short time involved, hardly seems commensurate with denial of discharge of the debt represented by the Judgment.

The court has found only one case addressing facts somewhat similar to that at bar. *See In re Gard*, 327 B.R. 372 (Bankr. N.D. Ind. 2003). *Gard* involved an adversary proceeding in which the plaintiff attempted to get a $170,000 judgment declared non-dischargeable under section 523(a)(2)(A). *Id.* at 75. The plaintiff represented the seller in a real estate purchase

Memorandum Opinion – Page 8

transaction. *Id.* The judgment included treble damages and attorney fees and had been awarded as a result of the debtor's issuance of two dishonored checks totaling $50,000. *Id.* The first check, for $5,000, represented the earnest money accompanying the defendant's offer to purchase the property. *Id.* The second, for $45,000, represented the balance of the $50,000 down payment. *Id.* Though the parties intended the defendant to be the ultimate payor of the down payment, the transaction was structured so that the plaintiff first issued a $50,000 check to his client, the seller. *Id.* The plaintiff then deposited the defendant's checks into his own account following the closing. *Id.* After writing the checks, the defendant failed to take possession of the property. *Id.* Though the plaintiff's check to his client cleared, the drawee bank returned the defendant's checks for insufficient funds. *Id.*

*Gard* is factually distinguishable from the case at bar. The *Gard* court did not consider the utterance of a bad check to constitute a misrepresentation *per se*, as Plaintiff contends is the case here. Rather, the court began its opinion by stating that the case did not involve a misrepresentation at all. *See id.* (stating that section 523(a)(2)(A) applies to "any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another," and not just to fraudulent misrepresentations) (internal citations omitted). The court instead focused on the defendant's state of mind throughout the transaction. Unlike the case at bar, the defendant did all that was required of him in tendering the earnest money, issuing the $5,000 earnest money check and the $45,000 check to cover the remainder of the down payment. *Id.* As far as can be discerned, the plaintiff in *Gard* had no reason to believe that closing could not go forward and the defendant's checks should not be deposited. The court found that "[the defendant] acted with the requisite intent to defraud when he allowed the transaction to proceed,"

Memorandum Opinion – Page 9

since "he knew those checks would not be honored when they were presented to the institution upon which they were drawn, he knew that he did not have the resources to make those checks good and took absolutely no action to do so." *Id.* at 376.

The facts of the case at bar require the court to reach a different result than the court in *Gard*. Unlike the defendant in *Gard*, Debtor's actions do not suggest he acted with fraudulent intent. Here, the parties plainly contemplated that Debtor's personal check would be replaced by a cashier's check or certified check before noon on May 2. Even if Debtor uttered his personal check knowing he did not have sufficient funds in his account for the check to clear, he lacked fraudulent intent in doing so since, at the time, he expected to provide Plaintiff with a cash equivalent instrument by May 2. Unlike the plaintiff in *Gard*, Eggleston had reason to know of Debtor's intention not to close, since Debtor failed to provide a cashier's or certified check by May 2. Eggleston instead caused deposit of Debtor's personal check on May 5 and caused Triton to go through with closing on May 6, signing the Seventh Amendment, a document Susan Lawler testified changed the terms of the contract. And, unlike in *Gard*, it appears from the record that the transaction here proceeded as a result of Eggleston's actions, and not as a result of fraudulent acts on the part of Debtor. The record simply does not contain evidence suggesting Debtor acted with fraudulent intent in his dealings with Plaintiff.

The plaintiff in *Gard* also suffered pecuniary loss as a result of the defendant's fraudulent actions. Such is not the case here. Under the Sixth Amendment, Debtor had until May 2 to tender the New Earnest Money. The Sixth Amendment provided that failure to tender the New Earnest Money by May 2 would terminate the contract. The parties contemplated Debtor tendering the money by providing a cashier's or certified check. The contract therefore became

Memorandum Opinion – Page 10

null and void once Debtor failed to do so by May 2. Plaintiff cannot have suffered pecuniary loss as a result of Debtor's failure to provide a cashier's or certified check by May 2, since Debtor's failure to satisfy that condition effectively terminated the contract before there was any earnest money for Plaintiff to claim. For the foregoing reasons, *Gard* is distinguishable from the case at bar.

*Gard* does suggest, however, that Plaintiff may be entitled to actual damages Triton suffered through reliance on Debtor's check. Eggleston initially testified that those damages were "negligible," but, upon being recalled to the stand by his counsel, testified that his time, 8 days at an hourly rate of $250, and the costs of attorneys in the state court suit, represented actual losses resulting from reliance on Debtor's check.[15] The court cannot see how fees incurred in the state court suit could have been incurred through Triton's reliance on Debtor's check being good. Thus, even accepting that Eggleston's expenditure of time is something obtained within the meaning of section 523(a)(2)(A) and assuming Eggleston worked 8 hours per day, actual damages resulting from Triton's reliance on the check would not exceed $16,000.[16]

Moreover, there is no evidence that a charge for Eggleston's time was made to Triton or included in the Judgment. Absent such a showing, the court questions how Eggleston's expenditure of time supports a finding that the Judgment or any part of it is not dischargeable.

Even if Plaintiff were able to show that Debtor obtained something of meaningful value from Triton, its case fails with respect to other elements. The court will thus address the

---

[15] There is no suggestion in the record that reliance on Debtor's check caused Triton to lose an alternative sale of the Property or resulted in deterioration in the value of the Property.

[16] Given the court's disposition of this adversary proceeding, it need not address the sufficiency (or lack thereof) of the proof of Eggleston's time.

question of reliance and whether Debtor's tender of a personal check for which he lacked sufficient funds constituted a false representation for purposes of section 523(a)(2)(A). The courts are split over whether the utterance of a check amounts to a representation that it will prove to be good. *Compare In re Mahinske*, 155 B.R. 547, 551 (Bankr. N.D. Ala. 1992) (applying the U.S. Supreme Court's holding in *Williams v. United States*, 458 U.S. 279 (1982), a non-bankruptcy case, and concluding that "no fraud will exist absent a positive statement regarding the sufficiency of the debtor's bank account"), *with In re Miller*, 112 B.R. 937, 940 n.1 (Bankr. N.D. Ind. 1991) (comparing split of authority between courts holding that "the issuance of a check carries an implied representation by the issuer that it will be honored or that there are sufficient funds available to cover the check," and courts deciding that "a check is not a statement or representation as to whether it will be honored upon presentment," and ultimately siding with the former position). Those cases in which the check was found to amount to a false representation often – though admittedly not always – involve some act or statement by the debtor in addition to the mere tender of the NSF check. *See, e.g.*, *In re Mullin*, 51 B.R. 377, 378 (Bankr. S.D. Ind. 1985) (debtor knowingly wrote additional bad checks to plaintiff even after plaintiff had informed him that original check had bounced); *Matter of Anderson*, 10 B.R. 296, 297 (Bankr. W.D. Wis. 1981) (debtor provided creditor with second check to cover check returned for insufficient funds and to pay for additional materials purchased from creditor).

In the case at bar the court can find no such additional fact that would have caused Triton to see Debtor's check as amounting to a representation that was in fact false. Indeed, the evidence suggests that, had he decided to proceed to closing after learning that the proceeds of the sale of the pipeline easement would benefit Triton rather than JD, Debtor would have

substituted a cashier's or certified check for his personal check or made that check good; he testified that he had, from his investors, the necessary funds to do so. Where a debtor has believed himself able and intended to make his check good, the courts have not found a false representation in the utterance of the check. *See Roebuck Auto Sales, Inc. v. Mahinske (In re Mahinske)*, 155 B.R. 547, 551 (Bankr. N.D. Ala. 1992) ("[H]onest people often write checks knowing that their funds are lacking, but do so with the honest belief that they will be able to make up the deficit before the check is presented."). Thus, on the record before it, the court cannot find that Plaintiff has met its burden of proving Debtor made a false representation by tendering the check.[17]

Even assuming that the court could find in Debtor's check the false representation necessary to support a determination of nondischargeability under section 523(a)(2)(A), it would not find the necessary reliance on the part of Triton. The case law instructs that reliance, for purposes of section 523(a)(2)(A), must be justifiable. *See Field v. Mans*, 516 U.S. 59, 74-75 (1995). The inquiry "focus[es] on whether the falsity of the representation was or should have been readily apparent to the individual to whom it was made." COLLIER ON BANKRUPTCY ¶ 523.08[1][d] (16th ed. 2009).

Plaintiff has not shown justifiable reliance on Debtor's check. Even assuming that reliance on a personal check tendered in the circumstances that existed at the April 30 meeting could be justifiable,[18] continued reliance on the check would clearly be misplaced after the noon

---

[17] The court reaches this conclusion without relying on Debtor's testimony that he warned everyone present at the April 30 meeting that his check was not covered.

[18] JD was required to put up a check after banking hours. The only available option at that point was a personal check. Especially given that the general understanding was that the check would be replaced with a cashier's or certified check by noon, May 2, it would be unreasonable to rely on Debtor's personal check even during the brief intervening time.

May 2 deadline passed without Debtor replacing the check and after Debtor's failure to execute the Seventh Amendment and his cessation of communications with Susan Lawler – all of which antedated deposit of Debtors' check. The court cannot see any basis for finding that Eggleston and Triton justifiably relied on Debtor's personal check, at least after noon on May 2.

Before concluding this memorandum opinion the court must take account of the context in which the utterance and dishonor of Debtor's personal check occurred. For Debtor did not tender his check from fraudulent intent. Rather, from the record before it, the court would find that Debtor intended that JD would perform under its contract with Triton as resurrected and amended by the Sixth Amendment. While the court does not have before it the Seventh Amendment, based on the plain meaning of the documents as they existed on April 30, the court finds and holds that the contract between the parties at that point provided, by reason of Addendum "A", that JD would receive the proceeds of sale of the pipeline easement or credit for them, notwithstanding the reduced purchase price stated in the Sixth Amendment. While Eggleston claimed prior spreadsheets and other communications made it clear that the Sixth Amendment already included such a credit in the purchase price, those communications are not in the record. The court finds by a preponderance of the evidence[19] that the Seventh Amendment, which apparently effectively eliminated the portion of Addendum "A" relating to the pipeline easement, changed the contract.

Thus, the court further finds and concludes that Debtor, rather than seeking to deceive with his NSF check, would have performed the contract as agreed to on April 30 in the Sixth Amendment. Though it was undoubtedly an inappropriate way by which to terminate the

---

[19] Testimony of Debtor and Susan Lawler.

parties' contract, Debtor's failure to replace his check on May 2 and to execute the Seventh Amendment amounted to a decision not to proceed with a deal he thought had changed. In such a context, the court could not find actionable misrepresentation or fraud in his conduct.

The court recognizes that its determination that the Seventh Amendment changed the contract may be at odds with the result in the state court suit. But the court does not have before it the Judgment – let alone the record of the proceedings in the state court – and so is free to reach its own conclusion respecting the facts. *See In re Leigh*, 165 B.R. 203, 219 (Bankr. N.D. Ill. 1993) (stating that a "clear and substantial record" from an earlier proceeding is necessary to enable the bankruptcy court to determine whether issue preclusion applies).

### III. Conclusion

For the foregoing reasons, the court must deny relief to Plaintiff. Court costs will also be assessed to Plaintiff. Counsel for Debtor is directed to prepare and submit a judgment consistent with this memorandum opinion.

<p style="text-align:center"># # # # # END OF MEMORANDUM OPINION # # # #</p>